## CHICAGO, R. I. & P. RY. CO. v. FANNING.
### No. 110.

Circuit Court of Appeals, Tenth Circuit.
January 27, 1930.

Henry C. Vidal, of Denver, Colo. (William V. Hodges and D. Edgar Wilson, both of Denver, Colo., on the brief), for appellant.

G. Dexter Blount, of Denver, Colo. (Henry T. McGarry, of Colorado Springs, Colo., and Harry S. Silverstein and David Rosner, both of Denver, Colo., on the brief), for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

Appellee recovered a judgment for personal injuries received by her at about nine p. m. March 2, 1927, when an automobile in which she and her husband were riding went into a deep cut made by appellant for its line of railway just north of the city limits of Colorado Springs. The cut is 24 feet deep, 75 feet wide, runs in an easterly and westerly direction and is spanned by a wooden bridge about 36 feet wide, which was constructed by appellant many years ago. The bridge accommodates heavy travel of all kinds as a connecting link between Nevada

avenue, a city street, and a highway to the north. The city boundary at this point is the railway right of way, and there is a space within the right of way of about 15 feet between the north end of the avenue and the south end of the bridge. This map, Defendant's Exhibit 1, reduced in size, shows the situation.

The avenue is paved, but its width is almost three times that of the bridge, and the pavement was narrowed along diagonal lines from the street corners to the south until it reached the city limits, where it is of the approximate width of the bridge. Between the end of the pavement, which is also the south boundary line of the railway's right of way, and the south end of the bridge, the city filled in with rock and gravel to make the approach a uniform grade. North bound traffic on the avenue passes over the roadway east of its parked center and south bound over the west roadway.

It is alleged in the complaint that the ground beyond the northerly boundary line of the easterly driveway and extending into the railway cut was eroded and washed out to the extent that a deep gully or gap, approximately 18 feet wide, extended from said boundary line down into the railway cut, which was dangerous to persons riding in automobiles in that locality, and that defendant had negligently and carelessly failed to fill in and grade said gully or gap and to repair the ground in and about that location and maintain it in a safe condition for automobile travel. It was further alleged that defendant was negligent in not maintaining a bridge and approaches wide enough to reasonably accommodate travelers and in failing to erect and maintain barriers, rails or fences or guards and lights or signals to warn travelers driving in a northerly direction that it was necessary to turn to the left in order to cross the bridge.

Plaintiff and her husband resided easterly of Nevada Avenue and southeasterly of this bridge. They had lived in the city about nine months. On the night of March 2, 1927, they started in the husband's automobile to Rose Garden, which is a short distance north of the bridge, to attend a dance. They had been over this bridge three or four times before this occasion, but in the night time, and were not otherwise familiar with the surroundings. Plaintiff was not desirous of attending the dance on this occasion but went on her husband's insistence. It was a misty, foggy evening. The husband drove the automobile and appellant sat by him on the front seat. Leaving home they went west until they came to the avenue, some sixteen to eighteen blocks south of the bridge, and then turned up the roadway on the easterly side. The street lights shone dimly because of the fog. Plaintiff and her husband could see through the windshield for about 20 feet, but not clearly for more than 6 or 7 feet. The automobile was driven at not more than 10 or 12 miles an hour. Appellant testified that she watched the roadway in front of them but could see only for a short distance ahead. She made no suggestions nor gave any directions to her husband about his driving. She looked through the bottom of the windshield at the glare of the lights on the pavement. She knew they were to cross a bridge but that was all. The husband testified that he drove not exceeding 12 miles an hour; that he could see probably 20 feet but not clearly for more than 5 or 6 feet; that just before his car went into the cut it looked like a continuation of the road; that the first he knew, a barbed wire struck the car when it was standing on an angle, "kinda on its nose," put out the lights and then the car slid down the embankment, passing about 3 feet east of the southeast corner of the bridge. His car was headed north when it went down. He did not see the bridge, he was watching the road at the time he went into the cut. He was driving in the center of the east driveway. There were no lights ahead of him, none beyond those shown on the plat. He did not know he had come to the bridge. On two or three former occasions when they went to Rose Garden he could see the full length of his car lights, ahead of him. As the car went into the cut it did not hit anything but a barbed wire fence. He saw what looked like a continuation of the road and went into the hole. He went back to the scene of the accident next morning and found a large hole where his car had run off. It was at the southeast corner of the bridge and extended about 14 feet easterly and was about 5 feet deep from the level of the pavement. It ran down about 7 or 8 feet and then tapered off. The pavement ran up to probably 3 or 4 feet of the hole. He did not see the hole or the bridge when his car went down.

Mr. Root, superintendent of building and real estate for The Colorado Springs Company, testified that he crossed over the bridge three or four times a week between 1924 and March 1927, that the bridge was right in line with the center parking of the avenue, and the paving tapered from the east side of the avenue up to the bridge; that there was a washout at that corner, caused by rains, and it had cut down the bank of the railway cut; it extended 16 or 18 feet; that prior to March 2, 1927, there was nothing from the southeast corner of the bridge except a barbed wire fence running from the southeast corner in an easterly direction. It ran over the top of the washout. The wire went across the hole. The hole extended 3 to 5 feet south of

where the barbed wire fence crossed it, and was 7 or 8 feet deep straight down and then gradual; that the southern edge of the washout was 2 or 3 feet from the edge of the paving. He had noticed these conditions since the early part of 1924. Other witnesses for plaintiff gave substantially the same testimony, except they differed as to the nearness of the washout to the edge of the paving or traveled way. None of them put it as near as did Mr. Root. Mr. Collins testified that the washout extended between 16 and 18 feet from the southeasterly corner of the bridge. The wire fence was over the hole, which extended 6 or 8 feet south of the wire, and that about the place where the Fanning car went into the cut the washout began between 4 and 6 feet north of the pavement, was 8 to 10 feet south of the easterly corner of the bridge and about 4 feet east. Defendant's Exhibit No. 1, supra, shows a plank fence extending southeasterly from the southeast corner of the bridge; but several witnesses testified there was no plank fence there prior to the accident, nothing but the wire fence across the washout. Several witnesses for defendant testified to the contrary, and they were in sharp disagreement with witnesses for the plaintiff as to the washout, its size, extent and locality. There was also a conflict in the evidence on the question whether a plank fence substantially as shown in Defendant's Exhibit No. 1 was there at the time of the accident. Some witnesses testified that it was there. And there was disagreement as to the effect of the fog on visibility and the safety of driving an automobile at that time. But all of this presented questions of fact for the jury, and the proof was ample to support conclusions in accord with the testimony of plaintiff's witnesses. There were no exceptions to the court's charge.

Appellant's specification of errors, in substance, are these:

1. Refusal of the court to sustain its motion for a directed verdict.

2. That even if the approach to the bridge was obscured by reason of the fog, that would be no ground for recovery unless the jury should find this fog was to have been anticipated by the defendant in the exercise of ordinary care.

3. Even if the jury should find that the condition of the approach to the bridge was such as to constitute negligence, nevertheless if it should further find that the proximate cause of the injury to plaintiff was the negligence of her husband in the operation of the automobile, the finding should be for defendant.

4. If the automobile was a family car for the joint and common use of plaintiff and her husband, and at the time of the accident she and her husband were using it in a joint enterprise and for their mutual pleasure and accommodation, and the husband was negligent in its operation, plaintiff would be chargeable with the negligence, and if that negligence contributed to causing the accident plaintiff could not recover.

5. The court erred in submitting to the jury the issue as to defendant's alleged negligence in permitting the washout to remain unfenced.

6. The court erred in overruling defendant's motion for a new trial.

■■ Counsel for appellant, in presenting the first specification, quotes this from 45 C. J. 860:

"If the owner of land makes an excavation thereon adjacent to a highway or so near as to make the use of the highway unsafe or dangerous he will be liable to a traveler who while using ordinary care falls into it and is injured";

—and then argues that negligence cannot be imputed to the railway company, because it did not lay out the street as shown in the map, supra, it did not by an act of commission make an excavation near the highway, its railway cut spanned by the bridge was lawfully there, the washout near the edge of the traveled way was due to the operation of the elements and it owed no duty of protection to travelers because of the washout. We cannot accept this contention as sound. We think the facts presented an issue for the jury as to whether the railway company was guilty of negligence as charged, under the facts, and whether that negligence was the proximate cause. There was credible testimony that the situation as we have described it had existed for more than two years. There can be no distinction in principle between the actual making of an excavation and one brought about by rainfall on the adjoining land of the owner and a sufficient lapse of time thereafter to charge the owner with notice of its existence. The washout was on appellant's right of way, not a part of the paved or traveled way but near thereto, and it was responsible for the continuance of the washout. In 45 C. J. at p. 869, it is stated:

"A person responsible for a dangerous place or instrumentality must guard, cover,

or protect it for the safety of persons or animals rightfully at or near it, and his failure to do so is negligence, rendering him liable to a person who, without fault on his part, is injured as a result thereof."

2 Shearman & Redfield on The Law of Negligence (5th Ed.) § 703:

An abutting owner "is likewise liable for maintaining an unguarded excavation on his own premises so near a highway as to be dangerous, under ordinary circumstances, for travelers on the way, using ordinary care to keep upon the proper path."

Judge Cardozo, in Hynes v. N. Y. C. R. Co., 231 N. Y. 229, 131 N. E. 898, 900, 17 A. L. R. 803, speaking for the court, said:

"Landowners are not bound to regulate their conduct in contemplation of the presence of trespassers intruding upon private structures. Landowners are bound to regulate their conduct in contemplation of the presence of travelers upon the adjacent public ways."

Cases sustaining liability of the landowner for injuries resulting from the maintenance of excavations adjacent to highways, among others, are: Hutson v. King, 95 Ga. 271, 22 S. E. 615; Crogan v. Schiele, 53 Conn. 186, 1 A. 899, 5 A. 673, 55 Am. Rep. 88; Smith v. Seawright, 33 Ga. App. 336, 126 S. E. 301; Bennett v. Bank, 100 Kan. 90, 163 P. 625; St. L. & S. F. Ry. Co. v. Ray, 65 Okl. 214, 165 P. 129, L. R. A. 1918A, 843; Goldstein v. Southern R. Co., 188 N. C. 636, 125 S. E. 177. After the lights on the avenue had been passed there was nothing beyond to guide one on to the bridge on a dark or stormy night, or give warning of the danger in going straight on; and we think the situation was sufficient to support the finding of the jury, which it was required to make, that a reasonably prudent person familiar with the situation would not have anticipated an accident of this sort.

■■ Defendant was not entitled to the requested charge referred to in specification No. 2. A material element was omitted therefrom: That defendant's negligence was not a contributing cause to the injury. The rule on the subject is stated in Shearman & Redfield on The Law of Negligence, supra, § 39:

"It is universally agreed, that if the damage is caused by the concurring force of the defendant's negligence and some other cause for which he is not responsible, including the 'act of God' or superior human force directly intervening, the defendant is nevertheless responsible if his negligence is one of the prox-imate causes of the damage, within the definition already given. It is also agreed that, if the negligence of the defendant concurs with the other cause of the injury, in point of time and place, or otherwise so directly contributes to the plaintiff's damage that it is reasonably certain that the other cause alone would not have sufficed to produce it, the defendant is liable, notwithstanding he may not have anticipated or been bound to anticipate the interference of the superior force which, concurring with his own negligence, produced the damage. But if the superior force would have produced the same damage, whether the defendant had been negligent or not, his negligence is not deemed the cause of the injury."

■ Specifications 3 and 4 cover in part the same subject. The first one relates to the claimed negligence of appellant's husband in operating the automobile, and the second one is on the theory that the husband and wife were using the automobile in a joint enterprise for their mutual pleasure, and it again couples therewith the husband's claimed negligence in the operation of the car. Each seeks to attribute the claimed negligence of the husband to the wife as a bar. Neither proposition can be supported. In Berry on the Law of Automobiles (4th Ed.) § 550, which follows a discussion of the rule as to occupants of cars being liable for the driver's negligence, we find this:

"The rule that the negligence of the operator is not imputable to a guest or passenger riding in the automobile, applies as between a husband, who is driving, and his wife, who is riding with him."

■ Whether the occupant be a stranger to the driver or a member of the driver's family, the negligent acts of the driver are in neither case imputable to the passenger, unless the relation between them is such as to entitle the passenger to give directions as to the operation of the automobile,—the relation of principal and agent or master and servant. And the same author, in section 566, says:

"The fact that a wife is riding with her husband in an automobile driven by him does not indicate that they are engaged in a joint enterprise."

See Dale v. Denver City Tramway Co. (C. C. A.) 173 F. 787, 19 Ann. Cas. 1223; Payne, Director General, v. Haubert (C. C. A.) 277 F. 646; Meecke v. Morguies, 128 Kan. 423, 278 P. 45; Phillips v. Denver Tramway Co., 53 Colo. 458, 128 P. 460, Ann. Cas. 1914B, 29; Colorado Springs & Inter-

urban R. Co. v. Cohun, 66 Colo. 149, 180 P. 307; Lewis v. La Nier, 84 Colo. 376, 270 P. 656; Norfolk & W. Ry. Co. v. James, 147 Va. 178, 136 S. E. 660; Pettitt v. Kansas City (Mo. App.) 267 S. W. 954. The evidence shows the wife did not desire to go out upon this occasion and went only upon the insistence of her husband. She gave no directions to her husband, so far as the record shows; in fact, there was no occasion that she do so. He testified that he drove cautiously, and neither had any apprehension of the impending danger of the car going into the cut until it had dropped into the washout nearby the traveled way and then in the darkness continued on down.

Nothing need be said about the sixth specification, and we think we have covered in the discussion the fifth.

The court in its charge to the jury called their attention to the fact that the weather conditions were very bad and charged that on that account it was the duty of the plaintiff and of the driver of the car to observe caution, to drive slowly and take every reasonable and proper precaution to avoid an accident; and, "If you believe from all the evidence that the plaintiff did not under all the surrounding conditions act as a reasonable and prudent person would, then, of course, it is your duty to find in favor of the defendant, irrespective of whether the defendant was negligent or not." We think, as did the trial court, that the case presented an issue for the jury as to the defendant's negligence. We doubt if the facts made an issue whether plaintiff was negligent; nevertheless, the court submitted it.

The specification of errors seems to be without merit and the judgment is affirmed.